934 F.2d 1414
 UNITED STATES of America, Plaintiff-Appellee,
v.
Dennis Chan LAI, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
Silas BRANDON, Defendant-Appellant.
 Nos. 88-1279, 88-1334.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted May 16, 1990.
Decided May 22, 1991.
As Amended on Denial of Rehearing
Aug. 13, 1991.
 
 Andrew French Loomis, Oakland, Cal., for Dennis Chan Lai, defendant-appellant.
 J. Frank McCabe, Goorjian & McCabe, San Francisco, Cal., for Silas Brandon, defendant-appellant.
 Michael J. Yamaguchi, Asst. U.S. Atty., San Francisco, Cal., for plaintiff-appellee.
 Appeal from the United States District Court for the Northern District of California.
 Before CHOY and FLETCHER, Circuit Judges, and FITZGERALD, District Judge.*
 CHOY, Circuit Judge:
 
 
 1
 Appellants Dennis Lai and Silas Brandon appeal from their convictions on numerous drug charges. We find most of their claims meritless. However, we remand to the district court for it to conduct an evidentiary hearing on whether certain alleged drug records were admissible into evidence. If after the hearing Lai's conviction and sentence for the crime of directing a continuing criminal enterprise stands, the district court is also instructed to vacate Lai's conviction and sentence for conspiring to distribute cocaine as an improper cumulative sentence.
 
 FACTUAL AND PROCEDURAL BACKGROUND
 The Entry and Search of Lai's Residence
 
 2
 On August 5, 1985 Officer Pearson of the San Francisco Police Department received an anonymous phone call informing him that appellant Dennis Lai and others were selling drugs out of Lai's residence, which was near Balboa Street and 19th Avenue in San Francisco. Lai lived with his mother at 594 19th Avenue.
 
 
 3
 The informant described Lai's physical appearance and said that a black man named "Si" acted as Lai's bodyguard and lived at Lai's residence. The informant stated that Lai had numerous guns including an Uzi machine gun in his house and that he might also have a police scanner. The informant explained that an Asian male named "Fook" would obtain orders for cocaine at his home, then take a cab to 19th and Balboa. Fook would have the cab wait while he walked down to Lai's residence to pick up the drugs. The informant said that Fook usually made numerous trips to Lai's residence between noon and three in the morning. He said that Fook was the source of his information. The informant also said he had seen Fook in possession of drugs and weapons on several recent occasions, and that he wished to remain anonymous because he feared retaliation.
 
 
 4
 Officer Pearson contacted Officer Wong of the Chinese Gang Task Force. Wong informed him that the Task Force believed Lai to be a large scale drug trafficker, and that he reportedly sold cocaine out of several San Francisco residences. The Task Force considered Lai armed and dangerous; they also suspected that he might have a radio scanner to monitor law enforcement activities.
 
 
 5
 The next day Officer Puccinelli placed Lai's residence under surveillance. Officer Puccinelli observed appellant Silas Brandon, apparently the bodyguard described by the informant, leave Lai's residence and reenter a few minutes later. Officer Pearson received a telephone call, presumably from the same anonymous informant, who stated that Fook was about to make a "run" to Lai's residence. Pearson went to the area but did not see Fook.
 
 
 6
 An hour later, Officer Pearson received another call from the informant saying Fook (now known to be Clifford Tom) was about to make another run. Officers Blessing, Mino, Hnatow, and Puccinelli met Pearson and took up surveillance around Lai's residence. Within half an hour the officers saw a cab park at the corner of 19th Avenue and Balboa. Fook got out of the cab, walked to Lai's residence, and went inside. Five minutes later he left the house and reentered the cab, which then drove away.
 
 
 7
 Three of the officers followed the cab in an unmarked squad car. After a few blocks, the officers stopped the cab and approached it. As Fook stepped out of the cab he dropped two bindles of cocaine. They arrested Fook, who told them that he had purchased the cocaine at Lai's residence.
 
 
 8
 The arresting officers then immediately went back to Lai's residence and conferred with Pearson. They decided those inside the house were likely to become suspicious when Fook failed to make his customary runs. The officers decided to enter Lai's residence immediately "to freeze the premises pending ... application of a search warrant."
 
 
 9
 Officer Pearson knocked at the door of Lai's residence and a woman answered. Pearson identified himself and his fellow officers and informed her that they were "freezing" the premises pending the obtaining of a search warrant. They entered the residence and went through each room of the house to gather all the occupants into the living room. The officers could see in plain view an Uzi machine gun, a sawed-off rifle, other firearms, a scale, and some packaging materials.
 
 
 10
 Three officers stayed at the residence while the other two went to obtain a warrant. Other officers from the Gang Task Force arrived as backup. Officers Pearson and Puccinelli returned about four hours later (10:20 P.M.) with a search warrant. The affidavit used to obtain the warrant included some information obtained during the warrantless entry of Lai's residence. Upon execution of the warrant the police found and seized approximately five kilograms of cocaine, some marijuana, drug paraphernalia, numerous weapons, a money counter, and handwritten and computer records apparently containing recordings of drug transactions.
 
 Proceedings Below
 
 11
 Appellants Lai and Brandon were charged along with nine other defendants in a forty-count indictment filed on May 26, 1987. Lai was the only defendant charged in count one with violating the federal "kingpin" statute, 21 U.S.C. Sec. 848. All defendants were charged in count two with conspiracy to distribute narcotics, 21 U.S.C. Sec. 846. Counts three through thirty-five charged Lai with distribution of or possession with intent to distribute cocaine either as a principal or as an aider and abettor under 21 U.S.C. Sec. 841. Lai was charged in count thirty-six with interstate travel in aid of racketeering, 18 U.S.C. Sec. 1952. Lai was charged in count thirty-seven with filing a false tax return, 18 U.S.C. Sec. 287.[1] Finally, counts thirty-eight through forty charged Lai with possession of illegal weapons, 26 U.S.C. Sec. 5861(d), (i). Brandon was charged in counts two, thirteen through eighteen, and count thirty-six.
 
 
 12
 Numerous pretrial motions were filed, including Lai's motion to suppress evidence seized from his residence on August 6, 1985. The district court denied Lai's motion to suppress.
 
 
 13
 Several of the appellants' co-defendants also agreed to plead guilty and testify against them. A jury trial for Lai, Brandon, and co-defendant Joe Chan commenced on April 4, 1988. The jury found Lai guilty of running a continuing criminal enterprise, 21 U.S.C. Sec. 848; conspiracy to distribute cocaine, 21 U.S.C. Sec. 846; thirty-two counts of distribution or possession with intent to distribute cocaine, 21 U.S.C. Sec. 841; interstate travel in aid of racketeering, 18 U.S.C. Sec. 1952; and the weapons charges, 26 Sec. 5861(d), (i).
 
 
 14
 The jury convicted Brandon of the conspiracy count, five counts of distribution of or possession with intent to distribute cocaine, and one count of interstate travel in aid of racketeering. On June 30, 1988, Brandon moved for a new trial, arguing that the prosecution had failed to disclose material information favorable to him in violation of Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). The district court, after a hearing, found that the information would not have made any difference even if the Government should have disclosed it.
 
 
 15
 On July 8, 1988, the district court sentenced Lai to consecutive terms of life imprisonment on count one, 20 years on count two, and 10 years on count three. The remaining sentences imposed are to run concurrently. The court also imposed a special assessment of $1,850 pursuant to 18 U.S.C. Sec. 3013.
 
 
 16
 Brandon received consecutive terms of 20 years on the conspiracy count, 20 years on the distribution or possession with intent to distribute counts, and five years on the interstate travel in aid of racketeering count. He also received special parole terms of five years on all but one count. Finally, the court assessed him $350 pursuant to 18 U.S.C. Sec. 3013.
 
 
 17
 Both Lai and Brandon timely appealed, and their cases were consolidated by court order on March 15, 1989.
 
 I. Other Bad Acts Evidence
 
 18
 Brandon argues that the district court erred in allowing the introduction of evidence about wrongful acts he allegedly committed outside the time period of the charged conspiracy. Brandon points to two places where he claims such acts were introduced into evidence in violation of Fed.R.Evid. 404(b)'s prohibition against admitting evidence of a defendant's prior crimes or wrongful acts to show bad character or propensity to commit crimes. See United States v. Brown, 880 F.2d 1012, 1014 (9th Cir.1989).
 
 
 19
 First, co-conspirator Quon testified that on two or three occasions in late 1982 he and Lai went to the federal building where Brandon worked as a DEA agent and brought a small quantity of cocaine to Brandon. Second, the Government's witness Stone testified that he purchased drugs from Brandon several times in late 1985; he could not remember any specific dates except one purchase near Thanksgiving, 1985.
 
 
 20
 Our first inquiry is to determine whether the evidence Brandon complains of was in fact evidence of "other crimes." Brandon was charged with being part of a conspiracy "[b]eginning at a time unknown to the Grand Jury and continuing to in or about October, 1985." The indictment charged that specific acts were done to further the conspiracy as early as July of 1983. However Brandon claims that the drug transactions in late 1982 to which Quon testified were not part of the conspiracy but "other acts." We disagree. Admission of Quon's testimony regarding these drug transactions is not barred by Rule 404(b) because it was direct evidence of the conspiracy. See United States v. Uriarte, 575 F.2d 215, 216-17 (9th Cir.) (1972 arrest was admissible as evidence of conspiracy where indictment set no starting date for conspiracy and majority of evidence described activities in late 1975 and early 1976), cert. denied, 439 U.S. 963, 99 S.Ct. 449, 58 L.Ed.2d 421 (1978). We are also convinced that Stone's testimony about drug purchases from Brandon around Thanksgiving of 1985 was direct evidence of the conspiracy and not "other act" evidence. The indictment charged that the conspiracy continued to "in or about October, 1985." Stone's testimony about a series of drug transactions around the end of November, 1985 concerned events which can properly be considered to have occurred within the time frame of the conspiracy charged in the indictment. See United States v. Rohrer, 708 F.2d 429, 435 (9th Cir.1983) (possession of drug related items in November, 1981 admissible as direct evidence of conspiracy alleged to extend until "at least" 1980).
 
 II. Alleged Brady Violations
 
 21
 Both appellants allege that the prosecution violated their due process rights under Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) by not disclosing information that could have been used to impeach the testimony of one of the Government's witnesses. This issue was raised under seal. Therefore we do not elaborate on the nature of the material withheld.
 
 
 22
 We review de novo challenges to a conviction based on a Brady violation. United States v. Gordon, 844 F.2d 1397, 1403 (9th Cir.1988). Under Brady, the suppression by the prosecution of evidence favorable to the accused violates due process where the evidence is material either to guilt or innocence. Favorable evidence includes impeachment evidence. Id. at 1402. Evidence is material only if there is a reasonable probability that had the evidence been disclosed, the result of the proceeding would have been different such that the court's confidence in the outcome is undermined. Id. at 1403.
 
 
 23
 We find that the evidence withheld in this case does not meet the materiality requirement of Brady. See United States v. Polizzi, 801 F.2d 1543, 1552-53 (9th Cir.1986). The information withheld does not undermine our confidence in Brandon's or Lai's conviction.
 
 III. Sufficiency of the Evidence
 
 24
 Both Lai and Brandon also challenge the sufficiency of the evidence against them on certain counts of distribution of or possession with intent to distribute cocaine. Both waived their objections to the sufficiency of the evidence by not renewing their motions for acquittal. United States v. Comerford, 857 F.2d 1323, 1324 (9th Cir.1988), cert. denied, 488 U.S. 1016, 109 S.Ct. 812, 102 L.Ed.2d 802 (1989). We therefore review only for plain error, so as to prevent a miscarriage of justice. United States v. Ramirez, 880 F.2d 236, 238 (9th Cir.1989).
 
 
 25
 Our inquiry is whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. United States v. Calabrese, 825 F.2d 1342, 1348 (9th Cir.1987). Even the uncorroborated testimony of an accomplice is enough to sustain a conviction unless it is incredible or unsubstantial on its face. United States v. Lopez, 803 F.2d 969, 973 (9th Cir.1986), cert. denied, 481 U.S. 1030, 107 S.Ct. 1958, 95 L.Ed.2d 530 reh'g denied, 483 U.S. 1012, 107 S.Ct. 3246, 97 L.Ed.2d 750 (1987). Assuming all the evidence presented at trial was properly admitted, there was ample evidence to support all the charges on which the jury found Lai and Brandon guilty.IV. Sentence Length
 
 
 26
 Lai and Brandon appeal the length of their sentences. They argue that they were penalized for exercising their right to trial, that their sentences are disproportionate and excessive, and that the district court failed to individualize their sentences. Lai argues, in addition, that his sentence violates the eighth amendment, and that the 1985 amendment to Sec. 848(b) mandating life sentences in very large scale drug trafficking shows Congress does not intend "small" kingpins like him to get life without parole.
 
 
 27
 Trial judges are accorded virtually unfettered discretion in sentencing defendants. U.S. v. Borrero-Isaza, 887 F.2d 1349, 1352 (9th Cir.1989). While a sentence within statutory limits ordinarily is not subject to review, the constitutional guarantee of due process applies to sentencing. Id. Thus the district court may not consider improper, inaccurate, or mistaken information, nor may it make groundless inferences in imposing sentence. Id. This circuit insists on individualized sentencing that takes the individual as well as the crime into account. United States v. Brady, 895 F.2d 538 (9th Cir.1990); United States v. Barker, 771 F.2d 1362 (9th Cir.1985).
 
 
 28
 The eighth amendment's cruel and unusual punishments clause prohibits both torturous and disproportionate sentences. Solem v. Helm, 463 U.S. 277, 284, 103 S.Ct. 3001, 77 L.Ed.2d 637 (1983). Our proportionality analysis under the eighth amendment is guided by objective criteria including (i) the gravity of the offense and the harshness of the penalty; (ii) the sentences imposed on other criminals in the same jurisdiction; and (iii) the sentences imposed in various jurisdictions for similar crimes. Id. at 292, 103 S.Ct. at 3010.
 
 
 29
 There is no support for Lai and Brandon's contentions that the judge punished them for exercising their right to a trial. Their sentences are below the maximum, thereby indicating that the judge did not mechanistically set their sentences at the maximum without consideration of their individual circumstances. There is simply nothing to indicate that the judge failed to individualize their sentences, nor does Lai's sentence violate the eighth amendment. Finally, the new mandatory life sentence for large scale dealers does not imply that Congress intended that only "king-kingpins" should be sentenced to life. Section 848(a) still allows for life sentences without parole.
 
 V. The Section 846 Sentence
 
 30
 Lai was convicted of directing a continuing criminal enterprise, 21 U.S.C. Sec. 848, and conspiring to distribute narcotics, 21 U.S.C. Sec. 846. The district court sentenced him to consecutive terms of life without parole and twenty years imprisonment, respectively.
 
 
 31
 In United States v. Hernandez-Escarsega, 886 F.2d 1560, 1582 (9th Cir.1989), cert. denied, --- U.S. ----, 110 S.Ct. 3237, 111 L.Ed.2d 748 (1990), this court held that "[o]nce it is determined that Congress did not intend cumulative punishment for the section 846 violation and the section 848 violation, the only remedy consistent with the congressional intent is for the sentencing court to vacate the convictions for the lesser offenses." Id., citing Ball v. United States, 470 U.S. 856, 864-65, 105 S.Ct. 1668, 1673, 84 L.Ed.2d 740 (1985).
 
 
 32
 In section VII of this opinion we remand this case to the district court for it to determine whether certain records had a proper basis for admission into evidence. These records relate to Lai's conviction for violating section 848. Thus at this time it is unclear whether Lai's section 848 conviction will stand. If, on remand, the district court determines that Lai's section 848 conviction stands, then we instruct the district court to follow the rule of Hernandez-Escarsega and vacate his section 846 conviction.
 
 
 33
 VI. Evidence Found In the Search of Lai's House
 
 
 34
 Lai challenges the admission of evidence found in the search of his house pursuant to a search warrant on the ground that the search warrant was issued on the basis of information obtained during the alleged illegal entry into Lai's home. Because we find that the police officers had probable cause to enter Lai's residence and that entry without a warrant was justified by exigent circumstances, this claim fails. The warrantless entry was not illegal.
 
 
 35
 We review de novo a district court's determination of the validity of a warrantless entry into a residence. United States v. Lindsey, 877 F.2d 777, 780 (9th Cir.1989). The district court's determination of underlying facts controls unless clearly erroneous. Id.
 
 
 36
 The securing of Lai's residence by the police was a seizure that implicated his fourth amendment rights. See Id. The Government therefore has a twofold duty. First, the Government must prove that the officers had probable cause to enter and secure the residence. Id. Second, the Government must show that exigent circumstances justified the warrantless entry. Id.
 
 A. Probable Cause
 
 37
 We hold that under the "totality of circumstances" known to the officers at the time they entered Lai's residence, there was a "fair probability" that contraband or evidence of a crime would be found inside. See Id., citing Illinois v. Gates, 462 U.S. 213, 238, 103 S.Ct. 2317, 2332, 76 L.Ed.2d 527 (1983).
 
 
 38
 The police received reliable information, in the form of an anonymous phone call, that Lai and others were selling drugs out of Lai's house. Their tipster's information was corroborated by predicted events coming to pass. The informant described how an Asian male named Fook would take a cab to a location near the Lai residence and have the cab wait for him while he picked up drugs. The informant said that Fook picked the drugs up at Lai's and that the house was somewhere near 19th Avenue and Balboa Street.
 
 
 39
 The police started surveillance in front of Lai's residence. The informant's description of a lieutenant in Lai's organization matched the appearance of a man the police saw at Lai's house. Their informant called them twice over a short period saying Fook was going to make a run. They did not see anything the first time, but the second time they saw exactly what the informant predicted. This might have been enough to create probable cause. However, the officers obtained more evidence.
 
 
 40
 Three officers followed Fook's cab and stopped it after a few blocks. As he stepped out, the police discovered cocaine which Fook admittedly obtained from Lai's moments earlier. The police knew at least one person was still in the house. At this point they clearly had a sufficient basis for believing that a search of Lai's home would uncover evidence of wrongdoing. See Illinois v. Gates, 462 U.S. at 236, 103 S.Ct. at 2331.
 
 B. Exigent Circumstances
 
 41
 "Exigent circumstances" are characterized as:
 
 
 42
 "those circumstances that would cause a reasonable person to believe that entry ... was necessary to prevent physical harm to the officers or other persons, the destruction of relevant evidence, the escape of the suspect, or some other consequence improperly frustrating legitimate law enforcement efforts."
 
 
 43
 United States v. Lindsey, 877 F.2d at 780-81, quoting United States v. McConney, 728 F.2d 1195, 1199 (9th Cir.) (en banc), cert. denied, 469 U.S. 824, 105 S.Ct. 101, 83 L.Ed.2d 46 (1984). Exigency necessarily implies insufficient time to obtain a warrant; therefore the Government must show that a warrant could not have been obtained in time. We evaluate the reasonableness of the warrantless entry in view of the totality of the circumstances seen from the perspective of the police officers at the time of the entry. Id. at 781.
 
 
 44
 The district court did not determine whether exigent circumstances justified the warrantless entry and search because it was certain that the disputed evidence would come in under the independent source doctrine. However, the factual record in this case clearly shows that sufficient exigency existed to justify the actions taken by the police. See United States v. Licata, 761 F.2d 537, 543 (9th Cir.1985) (finding exigent circumstances for first time on appeal). Because we determine that the warrantless entry was justified, we need not consider whether the contested evidence would be admissible under the independent source doctrine.
 
 
 45
 This court has previously recognized a correlation between the degree of exigency and the scope of permissible police action. After knocking and announcing their identity and purpose, specific inferences of exigency are necessary to justify a warrantless entry by the police which involves physical destruction of property. Only mild exigency need be shown where entry can be accomplished without physical destruction of property. United States v. McConney, 728 F.2d 1195, 1206 (9th Cir.) (en banc), cert. denied, 469 U.S. 824, 105 S.Ct. 101, 83 L.Ed.2d 46 (1984). In United States v. Hicks, 752 F.2d 379 (9th Cir.1985), this court required only a showing of mild exigency to justify a warrantless entry (involving no physical destruction of property) and cursory search of a house prior to a full search conducted pursuant to a warrant. We do not find it necessary to determine exactly where on the continuum from mild to severe exigency the case at bar lies. However, we are persuaded that at each step of the way sufficient exigency existed to justify the actions of the police.[2]
 
 
 46
 The police had been told by an informant whose information had proved reliable that Fook made numerous drug runs in a day and that Lai possessed weapons. The Chinese Gang Task Force also had information in its files that indicated Lai was armed. Fook's failure to return on drug runs due to his arrest created the possibility that the individuals in Lai's house would suspect police action and destroy evidence or prepare to defend the residence creating a danger of physical harm to police officers. "This court has repeatedly recognized that the apprehension of a drug courier can itself create an exigency if the drug supplier is likely to become suspicious when the courier fails to return." Lindsey, 877 F.2d at 781 (arrest of courier and reasonable belief that source would suspect police involvement triggering armed resistance to arrest creates exigency); United States v. Perdomo, 800 F.2d 916 (9th Cir.1986) (arrest of courier creates exigency, cocaine easily destroyed). The cases cited above deal with situations where the courier was expected to return with the proceeds of a drug transaction. While the Government has not shown that this was the arrangement between Lai and Fook, similar concerns about discovery of police action are evident here because of Fook's multiple drug runs on a daily basis.
 
 
 47
 In addition, Fook was arrested in public a few blocks from Lai's house and onlookers might have reported the arrest to Lai. United States v. Wulferdinger, 782 F.2d 1473, 1476 (9th Cir.1986) (public arrest of courier creates possibility that onlooker will inform source and supports finding of exigency).
 
 
 48
 Finally, both the informant and the Chinese Gang Task Force thought that Lai might have a police scanner. This possibility created another avenue through which Lai might have been apprised of police action.[3] On these facts we find that sufficient exigency existed to justify the officers' warrantless entry of Lai's home, which was accomplished without physical destruction of property, and their initial cursory search of the premises.[4] In their initial cursory search, the officers saw numerous weapons lying in plain view. Thus it was perfectly reasonable for them to hold the residents of the house in the living room pending arrival of the search warrant.
 
 VII. Drug Records
 
 49
 From the search of Lai's house the Government obtained what appeared to be handwritten and computer summaries of drug transactions. Brandon filed a motion in limine to prevent this evidence from being presented at trial on the ground that it was not authenticated as required by Fed.R.Evid. 901(a) and 901(b)(9). Brandon also reserved a hearsay objection.
 
 
 50
 At trial, Deborah Glazier, Lai's ex-girlfriend, testified that she had personal knowledge of the written summaries because she prepared some of them and knew that Lai had written the others. She also said that she was familiar with the computer printouts--that they were the handwritten summaries in computer form--but did not know who input the data into the computer. The Government moved to have the exhibits admitted into evidence. Brandon objected to admission of the hand written records on the ground that the records were hearsay and did not fall within the business records exception (Fed.R.Evid. 803(6)). The court overruled the objection stating that the exhibits were not coming in as business records but as indicia of criminal activity. The court also overruled Brandon's lack of foundation objection to admission of the computer records.
 
 
 51
 At the conclusion of the Government's case, Brandon moved to strike this evidence and Lai joined this motion. Previous to this point Lai never objected to the records being introduced into evidence. The district court denied the motion, stating:
 
 
 52
 ... the foundational requirements and the requirements for trustworthiness are appropriate when you're dealing with admissibility of records in a legitimate business activity. However, when you're dealing with records that have to do with drug dealing or illicit activity, they ... do not come within the purview of the evidence code with reference to their admissibility because they are not records in the true sense of the word, but they are indicia of criminal activity.
 
 
 53
 Because Lai did not make a timely objection to the records being introduced into evidence, we review this issue with respect to Lai only for plain error affecting substantial rights. United States v. Ordonez, 737 F.2d 793, 799 (9th Cir.1984). Since admitting the summaries potentially implicates Lai's rights under the Confrontation Clause, review is appropriate. Id. With respect to the evidentiary objections Brandon made at trial and continues to raise on appeal, we review the district court's rulings for abuse of discretion to the extent that factual determinations are involved. The district court's construction of the Federal Rules of Evidence is a question of law which we review de novo. United States v. Owens, 789 F.2d 750, 753 (9th Cir.1986), reversed on other grounds, 484 U.S. 554, 108 S.Ct. 838, 98 L.Ed.2d 951 (1988). We review Brandon's Confrontation Clause argument for plain error affecting substantial rights. Ordonez, 737 F.2d at 799.
 
 
 54
 The court apparently allowed the alleged drug records into evidence merely because they were indicia of criminal activity. The Government does not dispute that it used the records to help prove the truth of matters asserted therein, i.e. particular drug transactions during the course of the conspiracy. Therefore, the records do constitute hearsay and a proper foundational showing for admitting the records to prove the truth of the matters asserted must be established. Ordonez, 737 F.2d at 799, 805-06.
 
 
 55
 On appeal, the Government offers several theories under which the records may have been admissible. One particularly plausible theory is that the records were admissible as co-conspirator statements under Fed.R.Evid. 801(d)(2)(E). United States v. Smith, 893 F.2d 1573, 1577-79 (9th Cir.1990); United States v. Schmit, 881 F.2d 608, 613 (9th Cir.1989). There was other substantial evidence of the conspiracy, the statements appear to be in furtherance of the conspiracy, and at least some of the handwritten sheets were written by identifiable co-conspirators (Glazier and Lai). But Glazier also testified that non-drug transactions were sometimes recorded in the summaries, and these might not have been made in furtherance of the conspiracy. Our review of the record indicates that preliminary factual determinations necessary to insure a proper foundation for admitting the records, under this theory and the other theories the Government presents, simply were not made by the trial court.[5]
 
 
 56
 Under these circumstances we find the Sixth Circuit's opinion in United States v. Mahar, 801 F.2d 1477 (6th Cir.1986), instructive. In Mahar, the district court erroneously admitted alleged hearsay evidence (handwritten notes) under the business records exception and failed to make sufficient findings to justify admission of the evidence as co-conspirator statements under Rule 801(d)(2)(E). Consequently, the Sixth Circuit remanded the case to the district court with instructions to affirm the charges for which the notes were the primary evidence if the district court determined the notes would have been admissible under the co-conspirator theory, and to set aside the charges and conduct a new trial on these charges if the district court determined the evidence should have been excluded. Id. at 1504.
 
 
 57
 Lai and Brandon contend that the admission of the disputed handwritten and computer records mandates that their convictions for distribution of or possession with intent to distribute cocaine be reversed. Lai also contends that the admission of this evidence requires reversal of his conviction for running a continuing criminal enterprise. Lai and Brandon do not claim that the admission of these records bears on their other convictions.
 
 
 58
 We find, as the Sixth Circuit did in Mahar, that remand is appropriate here because there are preliminary factual issues which must be determined in this case before each possible basis for admitting the records can be considered. Therefore, with respect to only the convictions that Lai and Brandon argue should be reversed because these records were erroneously admitted, we remand to the district court for it to conduct a hearing to determine whether there was a proper basis for admitting each of these records.
 
 
 59
 If the district court finds that some of the disputed records should not have been admitted, it should then consider the prejudicial effect of these particular records in determining whether Lai and Brandon's convictions on particular counts must be vacated and a new trial ordered. Cf. United States v. North, 910 F.2d 843, 872-73 (remanding for factual findings and subsequent inquiry as to harm of possible evidentiary error), amended, 920 F.2d 940 (D.C.Cir.1990).
 
 VIII. Special Assessments
 
 60
 The Supreme Court has held that special assessments of the type imposed on appellants are constitutional. United States v. Munoz-Flores, --- U.S. ----, 110 S.Ct. 1964, 109 L.Ed.2d 384 (1990). We affirm the decision of the district court on this issue.
 
 CONCLUSION
 
 61
 We AFFIRM Lai's convictions for interstate travel in aid of racketeering and for possession of illegal weapons. We AFFIRM Brandon's convictions for interstate travel in aid of racketeering and for conspiracy to distribute narcotics. We AFFIRM the district court's imposition of special assessments on Lai and Brandon.
 
 
 62
 With respect to Lai's conviction for directing a continuing criminal enterprise and Lai and Brandon's convictions for distributing or possession with intent to distribute cocaine, we REMAND to the district court for it to determine if there was a proper basis for admitting the disputed handwritten and computer records into evidence. If there was no proper basis for admitting certain records into evidence, the district court should then consider the prejudicial effect of the wrongly admitted evidence in determining whether Lai and Brandon's convictions on particular counts must be vacated and a new trial ordered.
 
 
 63
 If, after this inquiry, Lai's conviction and sentence for directing a continuing criminal enterprise stands, we instruct the district court to VACATE his conviction for conspiracy to distribute narcotics. If Lai's conviction and sentence for directing a continuing criminal enterprise does not stand, we instruct the district court to leave in place his conviction and sentence for conspiracy to distribute narcotics.
 
 
 
 *
 The Honorable James M. Fitzgerald, Senior United States District Judge for the District of Alaska, sitting by designation
 
 
 [1]
 The Government later dismissed this count
 
 
 [2]
 A warrant could not have been obtained with sufficient speed. It was the experience of the commanding police officer that it typically takes three to four hours to prepare and secure approval of a warrant. This court has acknowledged that even obtaining a telephonic warrant is not a simple process. United States v. Lindsey, 877 F.2d 777, 782 (9th Cir.1989)
 
 
 [3]
 We evaluate the reasonableness of the warrantless entry in light of the facts known to the police officers at the time of the entry. United States v. Lindsey, 877 F.2d 777, 781 (9th Cir.1989). Thus the events reflected in Fook's statement, which were unknown to the officers at the time of entry, that the cab driver "returned to my house to let them know (Which he didn't)," is not one of the factors supporting the police officers' reasonable belief of exigency. However, in retrospect, this statement suggests that the officers' reasonable belief was well founded
 
 
 [4]
 This case does not require us to decide whether sufficient exigency existed to justify a complete search without a warrant. See United States v. Kunkler, 679 F.2d 187, 189 n. 1 (9th Cir.1982) (suggesting that though seizure may be justified by exigent circumstances, warrant is necessary for search). Cf. United States v. Lindsey, 877 F.2d 777 (9th Cir.1989) (finding of exigency justifies seizure and search). Here the officers took the minimal action they believed necessary under the circumstances. After securing the premises they waited for a search warrant before conducting a full-scale search of the house
 
 
 [5]
 The trial judge's cursory statement that coconspirators' statements were admissible was not a sufficient foundational ruling on the admissibility of the records under Rule 801(d)(2)(E)