**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Fabio JARAMILLO–SUAREZ, Defendant–Appellant.**

**No. 89–50313.**

United States Court of Appeals, Ninth Circuit.

Argued and Submitted June 5, 1991.

Decided Aug. 23, 1991.

As Amended on Denial of Rehearing and Rehearing En Banc Dec. 16, 1991.

Donald M. Re, Los Angeles, Cal., for defendant-appellant.

Steven D. Clymer, Asst. U.S. Atty., Los Angeles, Cal., for plaintiff-appellee.

Before FLETCHER and CANBY, Circuit Judges, and McNICHOLS, Chief District Judge, sitting by designation.

CANBY, Circuit Judge:

Fabio Jaramillo–Suarez (Suarez) appeals his conviction for conspiracy, in violation of 21 U.S.C. § 846, and possession of cocaine with intent to distribute, in violation of 21 U.S.C. § 841(a)(1). Suarez contends that numerous evidentiary and procedural errors committed at trial warrant reversal of his conviction. We disagree and affirm.

## BACKGROUND

In September 1986, agents from the California Department of Justice, Bureau of Narcotic Enforcement (BNE) began an investigation of Suarez by conducting a surveillance of his activities. They identified a certain apartment in San Juan Capistrano as one frequently used by Suarez.[1] The agents also determined that Suarez drove a 1986 blue BMW and had a girlfriend named Carmen Wilkinson.

On September 11, 1986, agents saw Suarez leave the San Juan Capistrano apartment in the BMW. He drove to a gas station approximately two miles from the apartment and used a pay telephone for approximately one hour to make and receive calls. Suarez left the gas station and drove to a shopping center in Costa Mesa, where he met codefendant Michael Eliott. Eliott had arrived at the center in a blue Chevrolet pickup truck. Suarez got into the truck, and he and Eliott drove across the street to a Roadway Inn.

Suarez and Eliott later left the Roadway Inn, each driving his own vehicle. The two men stopped at two shopping centers, but neither of them entered any stores. At the second center, Suarez and Eliott switched vehicles. After the car switch, the surveilling officers lost sight of Suarez in traffic for approximately ten to fifteen minutes.

One of the agents located Eliott's blue pickup truck in the open garage of an apartment in Laguna Niguel. Suarez was not in the truck. During the next hour and one-half, the agents saw other persons checking snaps on a cover of the cargo area of the truck. At the end of that period, Suarez drove the truck back to the shopping center.

In the meantime, Eliott had left the shopping center parking lot in Suarez' BMW and had driven around erratically, with no apparent destination. Eliott returned to the parking lot about ten minutes after Suarez arrived there in the truck. The two men went into a restaurant in the shopping center. In the restaurant, an agent overheard Suarez tell Eliott that he could not take care of him today but that he would take care of him tomorrow. Eliott responded by telling Suarez that tomorrow would be no problem.

Approximately a half hour later, Suarez and Eliott left the restaurant. While in the parking lot, Suarez removed some of the snaps on the cover to the truck's cargo area and pointed into the truck bed while talking to Eliott. Suarez then closed the cover, shook hands with Eliott, and left in his BMW. Suarez returned to the San Juan Capistrano apartment and Eliott returned to the room at the Roadway Inn.

The following day, September 12, 1986, Suarez left the San Juan Capistrano apartment and made telephone calls for approximately thirty minutes from a pay telephone at a gas station. At the same time, an agent in the room next to Eliott's room heard the telephone ring and heard a person state, "I'll see you around noon."

After making the telephone calls, Suarez returned to the San Juan Capistrano apartment. Later codefendant Berrios, arriving in a Suzuki Samurai, entered the apartment carrying a bulging manila envelope. Berrios and Suarez then left the apartment, with Suarez carrying an envelope that appeared to be the same one that Berrios had carried into the apartment. Suarez drove his BMW to the Roadway Inn. The surveillance team did not see Suarez initially meet Eliott nor did they see Suarez give Eliott the envelope.

The agents did observe Suarez and Eliott walking near the Roadway Inn. The two men then drove off in the BMW and made several stops. They came back to the

---

1. The apartment complex listed "Rick Suarez" as the occupant.

Roadway Inn, and then traveled to the San Juan Capistrano apartment each in his own vehicle. At the apartment, they loaded some packages into Eliott's pickup and drove together in the BMW to Dana Point where they spent approximately two hours before returning to the San Juan Capistrano apartment. Eliott returned to the Roadway Inn.

In the late afternoon of the following day, September 13, 1986, agents observed Eliott loading his truck and checking out of the Roadway Inn. As Eliott drove away, police and BNE agents stopped him. Eliott consented to a search of his truck. During the search, BNE agents found a manila envelope containing $25,500 in a briefcase. A dog trained to detect cocaine "alerted" on both the envelope and Eliott's truck.

On the basis of the evidence just described, the BNE agents obtained search warrants for the Laguna Niguel and San Juan Capistrano apartments. During the execution of the search warrant at the Laguna Niguel apartment, the BNE agents detained Berrios as he attempted to back the Samurai out of the garage. In the apartment, the agents found eighty-one kilograms of cocaine in four boxes and a suitcase. The agents also found numerous paper and plastic bags, money bags, tape, and a heat sealer at the apartment.

At the San Juan Capistrano apartment, the BNE agents forced the door and found Suarez' girlfriend inside. In the master bedroom, the agents found $130,000 in a briefcase, registration slips for a 1985 BMW vehicle and a 1986 BMW motorcycle,[2] and $8,000 and a pay/owe sheet in the top drawer of a dresser.

On September 22, 1986, border patrol agents at a secondary check point in San Clemente stopped a vehicle in which Suarez was a passenger. The federal agent found fifty-one $100 bills in Suarez' shoe. He also discovered Suarez' driver's license and a digital telephone paging device wedged between the console and passenger seat

where Suarez had been seated. Suarez was arrested.

On appeal, Suarez contends that numerous errors occurred at trial, any one of which constitutes reversible error. We address each of these contentions in turn.

### Analysis

**I. Pay/Owe Sheet**

Suarez contends that the district court erred by admitting into evidence a "pay/owe" sheet found at the San Juan Capistrano apartment. He claims the pay/owe sheet constitutes inadmissible hearsay not falling within any of the exceptions allowed by the Federal Rules of Evidence.[3] Suarez further contends that, even if the pay/owe sheet falls within one of the hearsay exceptions, the government failed to lay the foundation required by *United States v. Ordonez*, 737 F.2d 793 (9th Cir.1983). Specifically, Suarez contends that the government failed to establish that he had authored or was in any way connected to the pay/owe sheet.

As an alternative argument to those based on the rule against hearsay, Suarez contends that if the pay/owe sheet was properly admitted to prove the apartment was used for drug trafficking, the district court erred by permitting a government agent to testify as an expert witness that the document found was a pay/owe sheet and that a pay/owe sheet is a common form of recording drug transactions.

Finally, Suarez contends that the admission of the pay/owe sheet violates Federal Rule of Evidence 404(b), by permitting evidence of a defendant's prior bad acts to prove his propensity to commit the crime charged. We reject all of Suarez' contentions.

### A. Hearsay

■ Initially, Suarez asks too much of *Ordonez*, 737 F.2d 793, when he cites it for the proposition that drug-related doc-

---

2. Both BMWs were registered to Fabio Suarez.

3. Specifically, Suarez argues that the document does not constitute an adoption or admission

under Fed.R.Evid. 801(d)(2)(B) or a business record under 803(6).

uments are inadmissible for all purposes because they constitute hearsay. *Ordonez* simply holds that the rule against hearsay prohibits the admission of drug ledgers and pay/owe sheets to prove the truth of the matters asserted in them unless a proper foundation has been laid; *Ordonez* does not prohibit the use of the documents for all purposes.[4] Most relevant for present purposes is our statement in *Ordonez* that the rule against hearsay does not stand as a bar to the admission of ledgers as "circumstantial evidence 'to show the character and use of the place where the [ledgers] were found....'" *Id.* at 799, (quoting *United States v. Wilson*, 532 F.2d 641, 645 (8th Cir.), *cert. denied*, 429 U.S. 846, 97 S.Ct. 128, 50 L.Ed.2d 117 (1976)). *Cf. United States v. Crespo De Llano*, 838 F.2d 1006, 1018 (9th Cir.1987) (firearms, cash, mobile telephones, and paging devices found in a house were admissible as "probative of an overall narcotics trafficking conspiracy"); *United States v. Bernal*, 719 F.2d 1475, 1477–78 (9th Cir.1983) (scale, vials, a calculator and attached notation pad, plastic bags, zip lock bags, and money admissible as evidence of narcotics trafficking). The pay/owe sheet in the present case was admitted for the specific and limited purpose of showing the character and use of the San Juan Capistrano apartment. Its role is no different from that played by the very large amounts of cash found in the same apartment. Because the pay/owe sheet's probative value for the limited purpose for which it was admitted was independent of the truth of its contents, the rule against hearsay was not implicated and the requirement of "a proper foundational showing for admitting the records to prove the truth of the matters asserted" was not triggered. *See United States v. Lai*, 944 F.2d 1434, 1444 (9th Cir.1991) (citing *Ordonez*, 737 F.2d at 799, 805–06).

Our conclusion is in accord with that of the Eighth Circuit in *United States v. Wilson*, 532 F.2d 641 (8th Cir.) *cert. denied*, 429 U.S. 846, 97 S.Ct. 128, 50 L.Ed.2d 117 (1976), a case we cited with approval in *Ordonez*. In *Wilson*, the court held that, although drug ledgers found at an apartment frequented by the defendants could not be used to prove the truth of the statements made in the ledgers, they were properly admitted as circumstantial evidence "that the apartment was being used for drug trafficking." *Id.* at 645–46. The government was not required to prove the identity of the writer or writers. It was enough for the court that the government had established that the ledgers were found in one of the three houses the defendants frequented, even though that house was controlled by someone other than the defendants, and none of the defendants was present at the time the detective confiscated the ledger. In the present case, the government agent offered evidence that the pay/owe sheet was found in an apartment frequented by Suarez and rented to "Rick Suarez," and that other evidence such as vehicle registration slips belonging to Suarez were present in the apartment. The government's expert testified as to the nature of the document. This was enough of a showing to permit the pay/owe sheet to be admitted; the jury could consider the facts that the pay/owe sheet was evidence of drug-related activity, that it was linked to the San Juan Capistrano apartment, and that Suarez was also linked to the apartment.

In holding that drug-related documents may properly be admitted to prove the character and use of the place where found, we recognize the risk that the government or jury may erroneously rely

---

4. In *Ordonez*, we first determined that the government had relied on the drug-related documents to prove the truth of the statements contained in those documents. Only then did we analyze the adequacy of the foundation laid.

In a more recent case, *United States v. Lai*, 944 F.2d 1434 (9th Cir.1991); we again analyzed the adequacy of the foundation even though the trial court "apparently allowed the alleged drug records into evidence merely because they were indicia of criminal activity." *Id.* at 1444. In spite of this narrow purpose, the government admitted that it had used the records to help prove the truth of matters asserted therein. On appeal, we therefore treated the records as hearsay and held that "a proper foundational showing for admitting the records to prove the truth of the matters asserted must be established." *Id.*

on the document for the truth of the matters asserted therein.[5] *See Lai,* 944 F.2d at 1444. The trial court here was equally aware of the risk, and clearly instructed the jury that the sheet was "being admitted for the limited purpose of showing the character and use of the place where it was found and not for the truth of any matters asserted or whatever is on there says." The judge gave a similar instruction at the close of evidence. We conclude that the trial court adequately guarded against the risk of unfair prejudice.

### B. Expert Witness

■ Suarez contends that the district court erred by allowing an expert witness to testify about the pay/owe sheet.[6] Suarez presumably is arguing that the testimony did not come within the scope of Fed. R.Evid. 702.[7] The witness' testimony identifying the document as a pay/owe sheet provided specialized information to the jurors that was not readily known and that may have aided their understanding. *See* Fed.R.Evid. 702. The district court was well within its discretion in permitting the agent to testify. *See United States v. Martin,* 773 F.2d 579, 583 (4th Cir.1985) (expert witness' testimony identifying the documents as bookmaking records was a necessary foundation for admitting the documents, as they had no relevance otherwise).

### C. Other Acts

■ Finally, Suarez contends that in admitting the pay/owe sheet the district court effectively permitted evidence of Suarez' prior bad acts to prove Suarez' character and propensity to commit the crime in question. *See* Fed.R.Evid. 404(b)[8]. This contention fails for several reasons. First, as we have already noted, the district judge gave clear instructions to the jury that they were not to use the information in the pay/owe sheet, but could consider the pay/owe sheet as evidence of the character and use of the San Juan Capistrano apartment. No individual entry on the sheet was brought to the attention of the jury.

Second, the agent that identified the pay/owe sheet as a drug-accounting document testified that he did not know who wrote the document or when the document was written. In other words, no evidence was presented establishing that the entries on the pay/owe sheet represented prior bad acts of Suarez. Consequently, we reject Suarez' Rule 404(b) contention.

Finding no merit, then, in any of Suarez' various objections to the admission of the pay/owe sheet, we affirm the district court's ruling.

### II. Testimony Regarding Suarez' Driver's License and Pager

■ Suarez next argues that the district court committed reversible error by allowing into evidence testimony that Suarez' driver's license and a pager were found wedged next to the car seat which he had been occupying just prior to his arrest. Suarez asserts, and the government does not dispute, that this evidence of attempted concealment was employed to show consciousness of guilt. Suarez contends that

---

5. In the present case, the government does not admit, and Suarez does not contend, that the pay/owe sheet was used for the impermissible purpose of proving the truth of statements contained in that document.

6. At trial, an agent testified about the pay/owe sheet by giving a generalized description of it. The agent testified further that the drug ledger or pay/owe sheet was a form of recording sales and proceeds or funds from the sales of narcotics and a way of maintaining a record of how much narcotics were sold.

7. Rule 702 provides:
 If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

8. Rule 404(b) provides:
 **Other crimes, wrongs, or acts.** Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

*United States v. Silverman,* 861 F.2d 571 (9th Cir.1988), prohibits the admission of consciousness-of-guilt evidence under certain circumstances, which Suarez claims are present in this case. We disagree.

*Silverman* dealt with the propriety of a "consciousness of guilt" instruction, not with the admission of evidence. In *Silverman,* the district court had instructed the jury that it might infer guilt from Silverman's concealment of his identity from government agents. *Id.* at 580. We reversed the case on other grounds, but for purposes of retrial informed the trial court that this instruction was improper. We gave various reasons why the instruction was unduly prejudicial, but our major concern was that Silverman's concealment of his identity to agents who called at his home was equivocal; it might have arisen from any number of causes besides a consciousness of guilt. The concealment occurred some two months after the criminal act in furtherance of the charged conspiracy. We found that, under all the circumstances, "Silverman's concealment of his identity lacked sufficient connection to the criminal acts for which he was charged." *Id.* at 581.

A connection between the pager and the crime charged would be a proper inference in this case. There was testimony that telephone paging devices are frequently used by persons involved in drug trafficking. The pager itself is accordingly relevant evidence, wholly apart from the question of consciousness of guilt, and testimony as to the location where it was found simply provides the connection between the pager and Suarez. Suarez was a passenger in the car, and the fact that the pager was concealed next to his seat is important. Even more probative for purposes of connecting the pager to Suarez was the location of Suarez' driver's license with the pager. We find no error in the admission of this evidence as generally probative of the crime charged. *See United States v. Crespo De Llano,* 838 F.2d at 1018 (paging devices and other evidence found in house probative of narcotics conspiracy).

The trial court gave no "consciousness of guilt" instruction of the sort found detrimental to the defendant in *Silverman.* Suarez accordingly has no meritorious complaint about the admission of the pager, driver's license and its location. Even if the concealment of the pager and license were considered as showing consciousness of guilt, however, there was no reversible error. The act of concealing the pager and license was not fatally equivocal, as in *Silverman.* The concealment occurred during the period of the charged conspiracy, only ten days after Suarez' last meeting with Eliott. The connection between the concealment and the crime charged is quite direct. We have held on numerous occasions that the concealment of evidence subsequent to the commission of a crime may indicate consciousness of guilt and should be placed before the trier of fact. *See e.g., United States v. Castillo,* 615 F.2d 878, 885 (9th Cir.1980); *United States v. Brashier,* 548 F.2d 1315, 1325 (9th Cir.1976), *cert. denied,* 429 U.S. 1111, 97 S.Ct. 1149, 51 L.Ed.2d 565 (1977). *See also United States v. Feldman,* 788 F.2d 544, 555 (9th Cir.1986), *cert. denied,* 479 U.S. 1067, 107 S.Ct. 955, 93 L.Ed.2d 1003 (1987); *United States v. Hernandez–Miranda,* 601 F.2d 1104, 1106 (9th Cir.1979). We reject, therefore, all of Suarez' objections to the testimony regarding the pager and driver's license.

### III. Jury Instructions

 Suarez contends that the district court committed reversible error by failing to include "hesitate to act" language in its reasonable doubt instruction. We note first that the district court was permitted, but not required, to define reasonable doubt. *United States v. Nolasco,* 926 F.2d 869, 872 (9th Cir.1991) (en banc). We have said, however, that once the district court chooses to define reasonable doubt, it should not depart significantly from the "hesitate to act" language, *id.* at 871, announced in *Holland v. United States,* 348 U.S. 121, 140, 75 S.Ct. 127, 137, 99 L.Ed. 150 (1954).[9]

9. In *Holland,* the Supreme Court was presented

with a trial court's description of. reasonable

The jury instructions given in this case did not employ the "hesitate to act" language.[10] The district court gave Ninth Circuit Model Criminal Jury Instruction No. 3.04 (1985), which informed the jury that it should convict only if it found "the evidence so convincing that an ordinary person would be willing to make the most important decisions in his or her own life on the basis of such evidence."[11] In *United States v. Robinson*, 546 F.2d 309 (9th Cir.1976), *cert. denied*, 430 U.S. 918, 97 S.Ct. 1333, 51 L.Ed.2d 597 (1977), we made it clear that we preferred *Holland*'s "hesitate to act" formulation to an instruction requiring proof "such as you would be willing to act upon in the most important and vital matters relating to your own affairs." *Id.* at 313. We also exhorted trial courts to use the *Holland* instruction. *Id.* at 313–14. The reasons are well stated in the commentary accompanying the current version of this circuit's model instruction on reasonable doubt:

> The former model instruction instructed the jury to find the defendant guilty only if "you find the evidence so convincing that an ordinary person would be willing to make the most important decisions in his or her own life on the basis of such evidence." The Committee has rejected this analogy because the most important decisions in life—choosing a spouse, buying a house, borrowing money, and the like—may involve a heavy element of uncertainty and risk-taking

and are wholly unlike the decisions jurors ought to make in criminal cases. Commentary to Ninth Circuit Model Jury Instruction No. 3.03. We accept this reasoning, and again urge the trial courts not to give the "willing to act" instruction on reasonable doubt.

In *Robinson*, however, we did find that the giving of the "willing to act" instruction was not reversible error, in light of the charge taken as a whole. *Robinson*, 546 F.2d at 314. The reasonable doubt instruction given here was essentially indistinguishable from the one given in *Robinson*. While we do not hold that the inclusion of such an instruction can never constitute reversible error, we are satisfied that reversal is not required here. The instructions as a whole presented the case fairly and the reasonable doubt instruction, taken in context with all of the other instructions, did "not detract from the heavy burden suggested by the use of the term 'reasonable doubt' standing alone." *Nolasco*, 926 F.2d at 873.

## IV. In–Camera Hearing on Suarez' Request for Discovery and Disclosure of the Informant

■■■■■ Suarez contends that the government *may* have obtained material information from an informant and that Suarez was entitled to know the identity of that informant and the content of any in-

---

doubt as "the kind of doubt ... which you folks in the more serious and important affairs of your own lives might be willing to act upon." The Supreme Court stated that "this section of the charge should have been in terms of the kind of doubt that would make a person hesitate to act, ... rather than the kind on which he would be willing to act." *Holland*, 348 U.S. at 140, 75 S.Ct. at 138.

**10.** Our test for the adequacy of a reasonable doubt instruction is whether "the supplemental instruction [ ] detract[s] from the heavy burden suggested by the use of the term 'reasonable doubt' standing alone." *Nolasco*, 926 F.2d at 873.

**11.** The entire instruction states:
> I have told you that the government must prove the defendant's guilt beyond a reasonable doubt. A reasonable doubt is a doubt

based on reason and common sense. This means that you must return a not guilty verdict if, after you have considered all the evidence in this case, you have a doubt based on reason and common sense that the government has proved defendant's guilt. You may not convict on the basis of a mere suspicion. On the other hand, the government is not required to prove guilt beyond all possible doubt. You should return a guilty verdict if, but only if, you find the evidence so convincing that an ordinary person would be willing to make the most important decisions of his or her own life on the basis of such evidence. Ninth Circuit Model Jury Instruction No. 3.04 (1985). This instruction has been superseded by Ninth Circuit Model Jury Instruction No. 3.03 (1989). The key phrase of the 1989 instruction is: "Proof beyond a reasonable doubt is proof that leaves you firmly convinced that the defendant is guilty."

formation provided. Suarez failed to meet the burden imposed by *Roviaro v. United States*, 353 U.S. 53, 77 S.Ct. 623, 1 L.Ed.2d 639 (1957), to obtain either a hearing or disclosure of the identity of the informant, if one exists.

If an informant was involved in the investigation against Suarez, the only information that the informant could have provided was background information. There is no evidence to suggest that the informant was the only witness to any critical event, *United States v. Long*, 533 F.2d 505, 508 (9th Cir.), *cert. denied*, 429 U.S. 829, 97 S.Ct. 88, 50 L.Ed.2d 92 (1976), as in *Roviaro*. The government did not refer to an informant at the trial, but instead relied on evidence obtained by government agents engaged in surveillance of Suarez. Moreover, Suarez failed to show how disclosure of the informant's identity would have been "relevant and helpful," *Roviaro*, 353 U.S. at 60, 77 S.Ct. at 628, to his defense. Suarez was not entitled to an *in-camera* hearing under *Roviaro*.

Nor was Suarez entitled to an *in-camera* hearing or disclosure of the informant's identity in order to challenge the veracity of the search warrant affidavit. *See Franks v. Delaware*, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978); *United States v. Kiser*, 716 F.2d 1268 (9th Cir.1983). Suarez failed to establish any one of the five factors necessary to obtain an *in-camera* hearing. *See Kiser*, 716 F.2d at 1271. First, although Suarez has made specific allegations that indicate the portions of the warrant he claims are false,[12] we agree with the district court that these allegations are not supported by the facts. Second, Suarez does not contend that the alleged falsehoods were made deliberately or with reckless disregard for the truth. Third, Suarez made no offer of proof and submitted no affidavits. Fourth, Suarez has not challenged the veracity of the

search warrant officer rather than the informant. And finally, the challenged statements are not necessary to a finding of probable cause. *See id.*

The district court properly exercised its discretion in refusing to conduct an *in-camera* hearing before denying Suarez' motion for informant disclosure and discovery. *See United States v. Fixen*, 780 F.2d 1434, 1440 (9th Cir.1986) ("it is within the judge's discretion whether to hold such a hearing").

## V. Standing to Challenge the Envelope Search

Suarez contends that he has standing to challenge the search of the envelope containing $25,500 found in codefendant Eliott's truck. Because Suarez had no legitimate privacy interest in the envelope, *see United States v. Kovac*, 795 F.2d 1509, 1510 (9th Cir.1986), *cert. denied*, 479 U.S. 1065, 107 S.Ct. 951, 93 L.Ed.2d 1000 (1987), his contention fails.

## VI. Standing to Challenge Stop of Eliott's Truck

Suarez claims that the stop of Eliott's truck was illegal, thereby tainting Eliott's consent to search the truck, and tainting the search warrant affidavit of the apartments because the affidavit contained information acquired in the truck search. Suarez lacks standing to assert this claim. *See United States v. Kinsey*, 843 F.2d 383, 389–90 (9th Cir.), *cert. denied*, 487 U.S. 1223, 108 S.Ct. 2882, 101 L.Ed.2d 916 (1988); *Kovac*, 795 F.2d at 1510–11.

## VII. Probable Cause to Search the Two Apartments

[14] Suarez contends that there was no probable cause to search either of the two apartments. This contention lacks merit. Viewing the totality of the circumstances, *see Illinois v. Gates*, 462 U.S. 213, 230, 103

---

**12.** Suarez contends there was a discrepancy between the search warrant affidavit and the affidavit in support of the criminal complaint. Specifically, Suarez claims that the search warrant affidavit filed by the BNE suggests that the investigation was initiated by the DEA, while the complaint affidavit, executed by a DEA agent, states that the investigation was initiated by the BNE. The search warrant affidavit, however, refers to background information received from the DEA about Suarez. It never states that the DEA initiated the investigation. On the other hand, the complaint affidavit states that the BNE initiated the investigation.

S.Ct. 2317, 2328, 76 L.Ed.2d 527 (1983), facts sufficient to support a finding of probable cause exist. We have already recited most of them. Those facts include activities of Suarez and his associates during the surveillance, and the discovery of cash in Eliott's truck.

## VIII. Prosecutor's Comment on "Unexplained Wealth"

Suarez seeks reversal because of the prosecutor's reference in closing arguments to Suarez' "unexplained wealth." It is unlikely that this bare statement constituted an improper comment on Suarez' silence, but if it did, the error was harmless. The district judge immediately gave a curative instruction. The "unexplained wealth" statement does not constitute reversible error. *See United States v. Espinosa*, 827 F.2d 604, 616 (9th Cir.1987), *cert. denied*, 485 U.S. 968, 108 S.Ct. 1243, 99 L.Ed.2d 441 (1988).

## CONCLUSION

The conviction of appellant Suarez is AFFIRMED.